**ORIGINAL**

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 08-0570V
Filed: January 18, 2013
Filed for publication: March 24, 2014
(To be Published)

FILED
MAR 2 4 2014
U.S. COURT OF
FEDERAL CLAIMS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| DIANNA MATHIS, parent of [SDC], a minor | |
| Petitioner, | Autism; Statute of Limitations; Untimely Filed. |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DECISION[1]

On August 12, 2008, Dianna Mathis ("petitioner"), on behalf of her son, [SDC], filed a claim for compensation pursuant to the National Vaccine Injury Compensation Program ("Vaccine Program" or "the Program").[2] In her petition, she alleged that [SDC] developed an autism spectrum disorder ("ASD") as a direct and proximate cause of vaccinations that he received.[3] Petition at 2.

---

[1] Because this decision contains a reasoned explanation for the action in this case, I intend to post this decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 (2006)). In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in 42 U.S.C. § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted decision. If, upon review, I agree that the identified material fits within the requirements of that provision, I will delete such material from public access.

[2] The National Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C.A. §§ 300aa-10 et. seq. (2006). Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

[3] Petitioner also adopted "by reference the MASTER AUTISM PETITION FOR VACCINE COMPENSATION." Petition at 1. A petitioner utilizing that petition alleges that

Petitioner has the burden to demonstrate that her case was properly and timely filed under the Vaccine Act's statute of limitations. § 16(a)(2). Based on my analysis of the evidence, petitioner has not met her burden, and thus **this case is dismissed as untimely filed.**

### I.     Procedural History.

The petition filed on August 12, 2008, included petitioner's affidavit and two pages of medical records. *Id.* at 4-7.[4] Over the next six months, petitioner filed additional medical records.[5] On March 13, 2009, Respondent filed a Motion to Dismiss ("Resp. Mot."), arguing that petitioner's claim was untimely filed under the Vaccine Act's statute of limitations. Resp. Mot. at 1. *See* § 16(a)(2) (for the requirements of the Vaccine Act's statute of limitations). Petitioner filed a response on April 7, 2009, contending that the claim was timely filed. Petitioner's Response to the Respondent's Motion to Dismiss ("Pet. Resp. to MD") at 1-3. On April 10, 2009, petitioner also filed a letter from Dr. Mary N. Megson. *See* Medical Narrative from Dr. Megson.[6]

After the resolution of the Omnibus Autism Proceeding ("OAP")[7] test cases,[8] petitioner was required to inform the Court whether she wished to proceed with her

---

> [a]s a direct result of one or more vaccinations covered under the National Vaccine Injury Compensation Program, the vaccinee in question has developed a neurodevelopmental disorder, consisting of an Autism Spectrum Disorder or a similar disorder. This disorder was caused by a measles-mumps-rubella (MMR) vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis (DTP), Diphtheria-Tetanus-acellular Pertussis (DTaP), Hepatitis B, and Hemophilus Influenza Type B (HIB) vaccinations; or by some combination of the two.

Autism General Order #1, filed July 3, 2002, Exhibit A, Master Autism Petition for Vaccine Compensation at 2.

[4] The affidavit and two pages of medical records will be treated as part of the petition filed and referred to by page number in the order in which they were received and filed.

[5] Petitioner filed medical records containing Exhibits 1-8 on November 10, 2008. On January 12, 2009, petitioner filed medical records consisting of the same Exhibits 1-8 with the addition of Exhibits 9-11. Both filings of Exhibits 1-8 are identical. When referencing Exhibits 1-8. I will be citing to the November 10, 2008 filing. *See* Petitioner's Exhibits ("Pet. Exs.") 1-8 filed November 10, 2008; Pet. Exs. 1-11 filed January 12, 2009.

[6] Petitioner identified Dr. Megson's letter, which is dated March 29, 2009, as Exhibit # 1. Since petitioner already filed a different letter from Dr. Megson which is dated October 10, 2008 as Exhibit # 1, I will refer to this letter by its title, Medical Narrative from Dr. Megson.

[7] A detailed discussion of the OAP can be found at *Dwyer v. Sec'y of Health & Human Servs.*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

claim. Order. Sept. 27, 2010. In response, petitioner submitted medical records and reports "in support of" her pending claim. Notice, Nov. 22, 2010 at 1; see also reports of Drs. Megson and Lonsdale filed February 28, 2011. The court deferred any action on the timeliness of this case pending the Federal Circuit's en banc consideration of the panel's decision in Cloer v. Sec'y of Health & Human Services, 603 F.3d 1341 (Fed. Cir. 2010) vacated 399 Fed. Appx. 577 (Fed. Cir. 2010).[9]

Subsequent to the Federal Circuit's decision, the court ordered petitioner to show cause why this claim should not be dismissed as untimely filed. Order to Show Cause, July 24, 2012. See Cloer v. Sec'y of Health & Human Services, 654 F.3d 1322 (Fed. Cir. 2011) (en banc). On August 28, 2012, petitioner filed her response ("Pet. Resp. to SC Order"). In that response, petitioner did not dispute that the petition was untimely filed. Instead, petitioner argued only that such untimely filing should be excused pursuant to the doctrine of equitable tolling.

## II. Factual History.

[SDC] was born on August 15, 2002. Petitioner's Exhibit ("Pet. Ex.") 5 at 15. Petitioner did not submit medical records from [SDC]'s pediatrician, but other treatment records from the Easter Seals demonstrate that [SDC] was developing normally until 15-16 months of age (November to December of 2003), when his speech began to regress. Pet. Ex. 4 at 28; see also Pet. Resp. to MD at 1.

[SDC] received multiple vaccinations on December 30, 2003. Pet. Resp. to MD at 5. On March 21, 2005, [SDC] was evaluated by the Dennis Developmental Center and was diagnosed with autism. Pet. Ex. 4 at 28. [SDC]'s diagnosis was confirmed by Developmental Pediatrician Dr. Mary Megson in 2006. Pet. Ex. 1 at 1.

---

[8] The Petitioners' Steering Committee ("PSC"), an organization formed by attorneys representing petitioners in the OAP, litigated six test cases presenting two different theories on the causation of ASDs. Decisions in each of the three test cases pertaining to the PSC's first theory rejected the petitioners' causation theories. Cedillo v. Sec'y of Health & Human Servs., No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 89 Fed. Cl. 158 (2009), aff'd, 617 F.3d 1328 (Fed. Cir. 2010); Hazlehurst v. Sec'y of Health & Human Servs., No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 88 Fed. Cl. 473 (2009), aff'd, 604 F.3d 1343 (Fed. Cir. 2010); Snyder v. Sec'y of Health & Human Servs., No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), aff'd, 88 Fed. Cl. 706 (2009).[8] Decisions in each of the three "test cases" pertaining to the PSC's second theory also rejected the petitioners' causation theories, and petitioners in each of the three cases chose not to appeal. Dwyer v. Sec'y of Health & Human Servs., No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010), 2010 WL 892250; King v. Sec'y of Health & Human Servs., No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); Mead v. Sec'y of Health & Human Servs., No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

[9] During this time, petitioner filed Suggestions of Additional Authorities ("Pet. Suggestions") on April 16, 2012. Respondent filed a Response and Supplement to her Motion to Dismiss ("Resp. Suppl. Mot.") on May 1, 2012.

### III.     Diagnostic Criteria for Autism Spectrum Disorders.

No evidence concerning the diagnostic criteria for autism spectrum disorders was filed by the parties in this case. Accordingly, I have relied upon the information set forth below in Section III of this Decision, which is drawn from OAP test case testimony[10] provided by three pediatric neurologists with considerable experience in diagnosing ASD. I further note that the information in this section was first compiled and published by my colleague, Special Master Vowell, in *White v. Sec'y of the Dept. of Health & Human Servs.*, 04-337V, 2011 WL 6176064 (Fed. Cl. Spec. Mstr. Nov. 22, 2011).

"The terms 'autism' and 'autism spectrum disorder' have been used to describe a set of developmental disorders characterized by impairments in social interaction, impairments in verbal and non-verbal communication, and stereotypical restricted or repetitive patterns of behavior and interests." *Cedillo*, 2009 WL 331968, at *7 (Fed. Cl. Spec. Mstr. Feb. 12, 2009) (an OAP Test Case). The specific diagnostic criteria for ASD are found in the Diagnostic and Statistical Manual of Mental Disorders (American Psychiatric Association, 4th ed. text revision 2000 ("DSM-IV-TR"), the manual used in the United States to diagnose dysfunctions of the brain. *See* testimony of Dr. Eric Fombonne in *Cedillo* ("Fombonne Tr.") at 1278A.[11] The manual identifies the behavioral symptoms recognized by the medical profession at large as symptoms of ASD.[12] The DSM-IV-TR contains specific diagnostic criteria for autistic disorder, Asperger's disorder, and pervasive developmental disorder-not otherwise specified (most frequently referred to as ("PDD-NOS")). It is not uncommon for parents and even health care providers to use these terms in non-specific ways, such as referring to a child as having an "autism diagnosis," even though the specific diagnosis is PDD-NOS. Of note, a child's diagnosis within the autism spectrum may change from autistic disorder to PDD-NOS (or vice versa) over time.

---

[10] All of the evidence filed in the OAP test cases is available to any petitioner in the OAP, as well as to respondent. However, I note that there did not appear to be any material disputes in the OAP test cases about what constituted the early symptoms of autism or other ASD. Because omnibus test case decisions are not binding on the other omnibus participants, the primary advantage to both parties in conducting test case hearings is the creation of a body of evidence that can be considered in other cases. Snyder v. *Sec'y of Health & Human Servs.*, No. 01-162V, 2009 WL 332044, at *2-3 (Fed. Cl. Spec. Mstr. Feb. 12, 2009); Dwyer v. *Sec'y of Health & Human Servs.*, No. 02-1202V, 2010 WL 892250, at *2 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

[11] Transcripts from the OAP test cases, including *Cedillo*, may be accessed at http://www.uscfc.uscourts.gov/omnibus-autism-proceeding (last checked on June 19, 2012).

[12] Pervasive developmental disorder ("PPD") is the umbrella term used in the DSM-IV-TR at 69. I use the term ASD rather than PDD because of the possible confusion between "PDD" (the umbrella term referring to the general diagnostic category) and "PDD-NOS," which is a specific diagnosis within the general diagnostic category of PDD or ASD. *See Dwyer,* 2010 WL 892250, at *1 n.4 & *29 n.108.

4

A. Diagnosing Autism Spectrum Disorders.

The behavioral differences in autism spectrum disorders encompass not only delays in development, but also qualitative abnormalities in development. Fombonne Tr. at 1264A; testimony of Dr. Max Wiznitzer in *Cedillo* ("Wiznitzer Tr.") at 1589-91. There can be wide variability in children with the same diagnosis. One child might lack language at all, while another with a large vocabulary might display the inability to engage in a non-scripted conversation. Wiznitzer Tr. at 1602A-1604. However, both would have an impairment in the communication domain.

Testing for the presence of an ASD involves the use of standardized lists of questions about behavior directed to caregivers and parents, as well as observations of behaviors in standardized settings by trained observers. Fombonne Tr. at 1272A-74A. One behavioral symptom alone, such as hand-flapping, would not be diagnostic of an ASD, but if present, it would be a symptom that would be part of the diagnostic picture. As Dr. Fombonne explained, in diagnosing an ASD, "we try to observe symptoms, and when we have observed enough symptoms, then we see if the child meets these criteria." Fombonne Tr. at 1278A-79; *see also* testimony of Dr. Michael Rutter in the *King* OAP test case ("Rutter Tr.") at 3253-54 (describing diagnostic instruments and their use in clinical settings). *King,* 2010 WL 892296.

Typically in children with autism spectrum disorders, the symptoms have been present for weeks or months before parents report them to health care providers. Fombonne Tr. at 1283. The most common age at which parents recognize developmental problems, usually problems in communication or the lack of social reciprocity, is at 18-24 months of age. Rutter Tr. at 3259-60. The development of symptoms of an ASD occurs very gradually, and it is not uncommon for the parents to be unable to date the onset very precisely. Fombonne Tr. at 1285A-1286A.

1. Autistic Disorder (Autism).

A diagnosis of autistic disorder requires a minimum of six findings from a list of impairments divided into three domains of impaired function: (1) social interaction; (2) communication; and (3) restricted, repetitive, and stereotyped patterns of behavior, interests, and activities. At least two findings related to social interaction and at least one each in the other two domains are required for diagnosis. To meet the diagnostic criteria for autism, the child must have symptoms consistent with six of the twelve listed types of behavioral impairments. Furthermore, the abnormalities in development must have occurred before the age of three. Fombonne Tr. at 1264A, 1279; Wiznitzer Tr. at 1618; Rutter Tr. at 3250. Although the majority of children with autism have developmental delays, many are of normal intelligence. Fombonne Tr. at 1276; Rutter Tr. at 3256. In testimony in the *Cedillo* OAP test case, Dr. Wiznitzer described the three domains as the "core features" of a diagnosis on the autism spectrum. Wiznitzer Tr. at

1589-92. Children with autism are most symptomatic in the second and third years of life. Wiznitzer Tr. at 1618.

2. Pervasive Developmental Disorder-Not Otherwise Specified.

The DSM-IV-TR defines PDD-NOS as "a severe and pervasive impairment in the development of reciprocal social interaction," coupled with impairment in either communication skills or the presence of stereotyped behaviors or interests. DSM-IV-TR at 84. The diagnosis is made when the criteria for other autism spectrum disorders, or other psychiatric disorders, such as schizophrenia, are not met. *Id.* It includes what has been called "atypical autism," which includes conditions that present like autistic disorder, but with onset after age three, or which fail to meet the specific diagnostic criteria in one or more of the domains of functioning. *Id.* As was noted in the *Dwyer* OAP test case, this is the most prevalent of the disorders on the autism spectrum. *Dwyer*, 2010 WL 892250, at *30.

3. Asperger's Disorder.

Asperger's syndrome is a form of high-functioning autism. It presents with significant abnormalities in social interaction and with restricted, repetitive, and stereotyped patterns of behavior, interests, and activities. *See* DSM-IV-TR at 84.

B. The Domains of Impairment and Specific Behavioral Symptoms.

1. Social Interaction Domain.

This domain encompasses interactions with others. Fombonne Tr. at 1264A. There are four subgroups within this domain. Wiznitzer Tr. at 1594. The subgroups include: (1) a marked impairment in the use of nonverbal behavior, such as gestures, eye contact and body language; (2) the failure to develop appropriate peer relations; (3) marked impairment in empathy; and (4) the lack of social or emotional reciprocity. Wiznitzer Tr. at 1594-96. To be diagnosed with autism (autistic disorder), the patient must have behavioral symptoms from two of the four subgroups. Wiznitzer Tr. at 1594. For an Asperger's diagnosis, there must be two impairments in this domain as well. DSM-IV-TR at 84. Children who do not display "the full set of symptoms" are diagnosed with PDD-NOS. Fombonne Tr. At 1275A. Symptoms used to identify young children with impairments in the social interaction domain include lack of eye contact, deficits in social smiling, lack of response to their name, and the inability to respond to others. Fombonne Tr. at 1269A-70A.

Doctor Wiznitzer described the degrees of impairment in interactions with others as a continuum, with affected children ranging from socially unavailable to socially impaired. A child who is socially unavailable may exhibit such behaviors as failing to seek consolation after injury or purposeless wandering, or may simply appear isolated. Wiznitzer Tr. at 1598. A less impaired child might be socially remote, responding to an adult's efforts at social interaction, but not seeking to continue the contact. This child

6

might roll a ball back and forth with an adult, but will not protest when the adult stops playing. Wiznitzer Tr. at 1599. Given a choice between playing with peers and playing by himself, a child with impairments in social interaction will play by himself. *Id.* Some children with ASD demonstrate socially inappropriate interactions, such as pushing other children in an effort to interact. Wiznitzer Tr. at 1600. A higher functioning child might attempt interaction, but does so as if reading from a script. As an example, Dr. Wiznitzer discussed a patient who, when asked where he lived, could not answer, but responded appropriately when Dr. Wiznitzer asked the child for his address. *Id.* at 1601.

    2. Communication Domain.

The communication domain involves both verbal and non verbal communication, such as intonation and body language. Fombonne Tr. at 1263; Wiznitzer Tr. at 1602A. Language abnormalities in ASD encompass not only delays in language acquisition, but the lack of capacity to communicate with others. Fombonne Tr. at 1267A. Impaired communication abilities are one of the "most important and early recognized symptoms" of autism. *Dwyer,* 2010 WL 892250 at *31.

There are four criteria within the communication domain. Wiznitzer Tr. at 1602A. They include: (1) a delay in or lack of development in spoken language, without the use of signs or gestures to compensate; (2) problems in initiating or sustaining conversation; (3) stereotypic or repetitive use of language, including echolalia and repeating the script of a video or radio presentation, such as singing a commercial jingle; and (4) the lack of spontaneous imaginative or make-believe play. Wiznitzer Tr. at 1602A-05.

Language delay, limited babbling, lack of gestures, lack of pointing to communicate things other than basic wants and desires (lack of "protodeclarative" vs. "protoimperative" pointing), are all early symptoms used to diagnose impairments in the communication domain. Fombonne Tr. at 1266A-68A. Doctor Wiznitzer described the failure to share discoveries via language in autistic children as well. Wiznitzer Tr. at 1606A. Children with ASD who have more developed language skills may display difficulties in social communication outside their limited area of interest. *Id.* at 1607.

Within the communication domain, children with ASD have difficulties in joint attention, which Dr. Wiznitzer described as sharing an action or activity with another person or even an animal. They have problems with what he called metalinguistic skills, referring to the meaning behind the language used, which may be conveyed by tone, body language, humor, or sarcasm. Children with ASD may understand visual humor, illustrated by the cartoon of an anvil falling on the coyote's head, but lack the ability to understand a joke. Wiznitzer Tr. at 1607-09. They focus on the literal, rather than figurative, meaning of words: telling a child with ASD to "hop to it" may elicit hopping, rather than an increase in speed in completing a task. These children use language primarily for getting their needs met. *Id.* at 1609. A child with ASD might lead a parent to the cookie jar, but would not lead a parent to a caterpillar crawling along the sidewalk.

Children with ASD often have impairments in specific types of play. They may understand cause and effect play, but have difficulties in imitative or representational play. They can push a button to make a toy figure pop up, but have difficulty with holding a tea party, putting a stuffed animal to bed, or feeding a doll. Wiznitzer Tr. at 1610-11. They also have impairments in symbolic play, in which an object such as a stick represents another object, such as a magic wand or sword. *Id.* at 1612.

Speech and language delays are the symptoms most commonly reported by parents as a concern leading to a diagnosis of ASD. *See* Fombonne Tr. at 1284 (one of first concerns noted by parents is the lack of language development); Rutter Tr. at 3253. (problems in social and communication domains tend to be observed much earlier than stereotyped behaviors).

A deficit in at least one of the subgroups in the communication domain is required for an autism diagnosis. Wiznitzer Tr. at 1602A-1603. An Asperger's diagnosis does not require a communication domain impairment. *See* Fombonne Tr. at 1275A-76. A PDD-NOS diagnosis requires an impairment in either this domain or the patterns of behavior discussed next. *See* Wiznitzer Tr. at 1592.

3. Restricted, Repetitive and Stereotyped Patterns of Behavior Domain.

There are four categories within this domain. They include (1) a preoccupation with an interest that is abnormal in intensity or focus, such as spinning a plate or a wheel or developing an intense fascination with a particular interest, such as dinosaurs, cartoon characters, or numbers; (2) an adherence to nonfunctional routines or rituals, such as eating only from a blue plate, sitting in the same seat, or walking the same route; (3) stereotypic or repetitive motor mannerisms, such as finger flicking, hand regard, hand flapping, or twirling; and (4) a persistent preoccupation with parts of an object, such as focusing on the wheel of a toy car and spinning it, rather than playing with the toy as a car. Wiznitzer Tr. at 1613A-15; Fombonne Tr. at 1271A-72A.

As Dr. Fombonne explained, this domain reflects abnormalities in the way play skills develop, as well as repetitive and rigid behavior. Fombonne Tr. at 1264A. A typical toddler may flick a light switch a few times, but the child with ASD performs the same action to excess. Wiznitzer Tr. at 1616. Doctor Rutter described one child who would not turn right; to make a right turn at a crossroads, he would have to make three left turns. Rutter Tr. at 3252-53.

For a diagnosis of autism, a child must display behaviors in at least one of the categories included in this domain. Wiznitzer Tr. at 1613A. An Asperger's diagnosis also requires at least one behavioral impairment encompassed in this domain. *See* Fombonne Tr. at 1275A-76. A PDD-NOS diagnosis requires either an impairment in this domain or an impairment in the communication domain. *See* Wiznitzer Tr. at 1592.

D. Summary.

The OAP evidence establishes that a diagnosis of ASD is based on observations of behavioral symptoms. The symptoms are categorized into three domains.

For a definitive diagnosis of autism, the child must display behavioral abnormalities in each of the domains, and must exhibit at least six of the 12 behavioral criteria in the three domains. There must be at least two behaviors encompassed in the social interaction domain, reflecting the importance of impaired social interaction in diagnosing ASD. The behavioral abnormalities must manifest before the age of three.

Thus, the absence of any specific symptom would not rule out the diagnosis, so long as the requisite numbers of impairments in each domain of functioning are present. Conversely, autism cannot be diagnosed by any single abnormal behavior, but the ultimate diagnosis is based on an accumulation of symptomatic behaviors. The existence of any one behavioral abnormality associated with autism is sufficient to trigger the running of the statute of limitations.

For a diagnosis of Asperger's disorder, the child must display behavioral abnormalities similar to those of children with autistic disorder, but need not have a language abnormality. Fombonne Tr. at 1275A-76; *see also* DSM-IV-TR at 84 (requiring two impairments in social interaction and one in restricted, repetitive, and stereotyped patterns of behavior, interests, and activities for this diagnosis).

For a PDD-NOS diagnosis, the child must display behavioral abnormalities in all three domains. However, this diagnosis is given when the impairments fall short of the criteria required for a diagnosis of autism (autistic disorder). Fombonne Tr. at 1275A.

### IV.   Legal Standard.

The Vaccine Act provides that:

> a vaccine set forth in the Vaccine Injury Table which is administered after October 1, 1988, if a vaccine-related injury occurred as a result of the administration of such vaccine, no petition may be filed for compensation under the Program for such injury after the **expiration of 36 months** after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury . . . .

§ 16(a)(2) (emphasis added). In *Cloer*, the Court of Appeals for the Federal Circuit affirmed that the statute of limitations begins to run on "the date of occurrence of the first symptom or manifestation of onset of the vaccine-related injury recognized as such by the medical profession at large." 654 F.3d at 1325. This date is dependent on when the first sign or symptom of injury appears, not when a petitioner discovers a causal relationship between the vaccine and the injury. *Id.* at 1339.

Under *Cloer*, equitable tolling of the statute of limitations may occasionally occur, but only in "extraordinary circumstances," such as when a petitioner files an improper

tort claim or is the victim of fraud or duress. *Id.* at 1344-45 (*citing Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). *See also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)). Equitable tolling may not apply simply because the statute of limitations deprives a petitioner of his or her claim. *Cloer*, 654 F.3d at 1344.

## V. Petitioner's Claim was Untimely Filed

Petitioner concedes that "the court [] correctly determined that [SDC] was diagnosed with autism spectrum [disorder] on March 21, 2005. Therefore to be timely [filed] his vaccine claim had to [have] been filed, not later than March 20, 2008." Pet. Resp. to SC Order at 1. The petition in this claim was filed on August 12, 2008, and thus petitioner concedes that her claim was untimely filed. First, I will briefly address why petitioner's claim is untimely filed, and then I will discuss why it is not legally appropriate to apply the doctrine of "equitable tolling" to petitioner's claim.

## VI. Analysis

To be timely filed, petitioner must have filed her claim no later than three years after the first symptom or manifestation of [SDC]'s autism. *Cloer*, 654 F.3d at 1325. Petitioner's medical records show, and petitioner has conceded, that [SDC] experienced a regression in his speech development at 15 months of age in November 2003. Pet. Ex. 4 at 18; Pet. Resp. to MD at 1. As discussed earlier, speech and language delay is a recognized symptom of autism. *See supra*, Section III. Part. B.2. *See also White v. Sec'y of the Dept. of Health & Human Servs.*, 04-337V, 2011 WL 6176064 (Fed. Cl. Spec. Mstr. Nov. 22, 2011) (the Special Master concluded that although not sufficient by itself to establish a diagnosis of autism, speech and language delay can constitute the first symptom or manifestation of onset of autism). [SDC] was diagnosed with autism on March 21, 2005. Pet. Ex. 4 at 28; Pet. Resp. to SC order at 1.

Petitioner's medical records and statements establish that this claim is untimely filed. The petition was filed on August 12, 2008. Accordingly, to be considered timely filed under the Vaccine Act's statute of limitations, the first medically recognized sign or symptom of autism must have occurred no earlier than August 12, 2005. It is evident from the record discussed above, that the first medically recognized sign or symptom of [SDC]'s autism occurred earlier than August 12, 2005.

As also discussed above, petitioner has *conceded* that this claim was untimely filed, stating that "the court [] correctly determined that [SDC] was diagnosed with autism spectrum [disorder] on March 21, 2005. Therefore to be timely [filed] his vaccine claim had to [have] been filed, not later than March 20, 2008." Pet. Resp. to SC Order at 1. However, petitioner goes on to argue that equitable tolling should be applied in this case. *Id.* at 2. Petitioner avers that she received incorrect advice from an attorney, Ramon Rodriguez, who spoke to her by phone on March 12, 2008, and sent her a letter reiterating his belief "that the statute of limitations has already run" in this claim. Letter from Ramon Rodriguez dated March 13, 2008 (attached to Pet. Resp. to SC Order) at 1. Thus, petitioner asserts that "but for the improper advice given [to] her by Mr.

10

Rodriguez" she "would have been able to prosecute her vaccine claim within the required" statute of limitations. Pet. Resp. to SC Order at 2. Petitioner is mistaken.

It is the occurrence of the *first symptom or manifestation* of [SDC]'s autism, not his diagnosis, which starts the running of the Vaccine Act's statute of limitations.[13] I find that [SDC]'s first symptom of autism occurred in November or December of 2003 when he experienced a regression in his speech development at 15-16 months of age. Pet. Ex. 4 at 18; *see also* Pet. Resp. to MD at 1. Thus to have been timely filed petitioner must have filed her claim prior to December 2006. Instead, petitioner filed her petition on August 12, 2008, more than 19 months too late. Thus, Mr. Rodriguez did not give petitioner erroneous advice regarding the statute of limitations when he spoke to petitioner on March 13, 2008. Even if petitioner would have filed her petition on March 13, 2008, the petition would have been untimely filed. Accordingly, even if it were appropriate to apply the doctrine of equitable tolling to the instant claim it would not save the claim for dismissal as untimely filed.

### VII. Conclusion.

I have great sympathy for the tragic disorder from which [SDC] suffers. Under the applicable law, however, petitioner has the burden to show timely filing. Petitioner has failed to do so. There is preponderant evidence that this case was not filed within "36 months after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury" as required by the Vaccine Act, § 16(a)(2). Petitioner also has failed to demonstrate any extraordinary circumstances warranting equitable tolling. **Therefore, this claim is dismissed as untimely filed under the Vaccine Act's statute of limitations. §16(a)(2). The clerk is directed to enter judgment accordingly.**

**IT IS SO ORDERED.**

George L. Hastings, Jr.
Special Master

---

[13] The Federal Circuit noted that the petitioner in *Cloer* also argued that her petition was timely filed since it was filed within three years of her diagnosis before the Special Master and United States Court of Federal Claims, but that both rejected that argument based on the precedent of the Federal Circuit. *Cloer*, 654 F.3d 1328-29. The Federal Circuit further noted the petitioner in *Cloer* abandoned "her argument that no vaccine-related injury can occur before a clinically definite diagnosis is made" when preparing her initial briefs for review by their Court. 654 F.3d 1330.